IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                     CR No. 11-1206 JP

JERRAD BOWEN,

    Defendant.

## MEMORANDUM OPINION AND ORDER

On October 24, 2011, the Court held a hearing on DEFENDANT'S MOTION TO SUPPRESS ALL ITEMS SEIZED FROM THE VEHICLE BELONGING TO DEBRA SPRICK AS A FRUIT OF AN UNCONSTITUTIONAL STOP AND DETENTION (Doc. No. 28), filed September 15, 2011 (Motion to Suppress) as well as on various other motions filed by the United States of America (USA).  Attorney Penni Adrian represented Defendant who was present at the hearing.  Assistant United States Attorneys Lynn Wei-Yu Wang and Jeremy Peña represented the United States of America.  The subject of this MEMORANDUM OPINION AND ORDER is the Motion to Suppress. The Court has already ruled on the USA's motions.  ORDER (Doc. No. 52), filed Oct.27, 2011.

Defendant argues in the Motion to Suppress that law enforcement officers, in this case Deputy United States Marshals (DUSMs), violated his Fourth Amendment rights when the DUSMs initially stopped the Ford Ranger pickup truck in which he was a passenger, when the DUSMs continued to detain him after the stop, and when the DUSMs seized a gun from the Ford Ranger as a fruit of his illegal detention.  The burden is on Defendant to prove that his seizure or detention violated the Fourth Amendment.  *See, e.g., United States v. Rosborough*, 366 F.3d

1145, 1148 (10th Cir. 2004).  Having reviewed the briefs, the relevant law, the admitted exhibits, the testimony of witnesses at the October 24, 2011 hearing, and the argument of counsel at that hearing, the Court concludes that the Motion to Suppress should be denied.

Findings of Fact

On April 19, 2011, at approximately 9:30 p.m., DUSM Vincent Gambone parked his undercover vehicle (with tinted windows) three houses from 3010 General Stillwell St. NE, Albuquerque, New Mexico to observe Defendant's house at 3010 General Stillwell St. NE. DUSM Kent Ballard was with DUSM Gambone in the vehicle.  DUSM Gambone's view of the house was obstructed by foliage and his windshield column.  DUSM Gambone had information which led him to believe that Brian Tredway, a convicted felon with a lengthy violent criminal history and who was a lieutenant in the Aryan Brotherhood, was staying with Defendant at his home.  Tredway had absconded from a half-way home in violation of his parole.  DUSM Gambone also had information that Tredway possessed a shotgun and a handgun.  Moreover, DUSM Gambone knew prior to April 19, 2011 that Defendant was likewise a member of the Aryan Brotherhood who had been previously arrested with Tredway in an incident concerning a kidnaping and the discharge of a firearm in a home.  DUSM Gambone knew at that time that Defendant had a lengthy violent felony criminal history.  DUSM Gambone also knew prior to April 19, 2011 that Tredway and Defendant looked similar, i.e., they were Caucasian males, they were of a similar height, and they both had bald heads and goatees with mustaches.

While observing the house at 3010 General Stillwell St. NE, DUSM Gambone saw two persons leave the house and get into a Ford Ranger parked in the driveway.  DUSM Gambone could not see the driver, Debra Sprick (Defendant's fiancee and owner of the Ford Ranger), but DUSM Gambone saw the passenger who DUSM Gambone contends looked like Tredway.

DUSM Gambone then called for backup surveillance.  Two undercover vehicles (with tinted windows) arrived with two DUSMs in each vehicle.  After the Ford Ranger left the driveway, DUSM James Badway followed the Ford Ranger through a residential neighborhood.  DUSM Chris White was with DUSM Badway.  The third backup surveillance vehicle, in turn, followed DUSM Badway.  DUSM Gambone also followed the vehicles.

The persons in the Ford Ranger realized that they were being followed and pulled over to allow DUSM Badway to pass.  After DUSM Badway passed the Ford Ranger, Defendant instructed Ms. Sprick to follow DUSM Badway very closely and in an aggressive manner.  DUSM Badway then exceeded the speed limit in the residential area trying to lose the Ford Ranger.  The Ford Ranger, however, sped up and kept close to DUSM Badway's rear bumper.  DUSM Badway believed that his vehicle might be rammed by the Ford Ranger and even thought about retrieving his firearm.  Fearing that an altercation may ensue, DUSM Gambone, by radio contact, directed the DUSMs to pull over the Ford Ranger.  DUSM Badway decided to stop next to a park for community safety reasons.  As DUSM Badway pulled over, the undercover vehicles put on their police lights and sirens.

DUSMs Badway and White then existed their vehicle with weapons drawn.  Various DUSMs shouted "police" and shouted at Ms. Sprick and Defendant to put their hands where they could be seen.  DUSM Badway maintains that he approached the driver's side and saw through the driver's window that the passenger was putting something between the front seats.  DUSM Badway contends that he thought that the passenger was trying to conceal contraband and yelled something to that effect.  According to DUSM Badway, DUSM White yelled at the passenger to put his hands where they could be seen.

3

DUSM Badway asked the driver if there was a weapon and Ms. Sprick responded that she did not have a weapon. DUSM Badway contends that Ms. Sprick then leaned back and glanced toward the passenger. DUSM Badway further contends that at that point he could see the handle of a handgun, in plain view, sticking out from between the two front seats and that he yelled "gun" and instructed the occupants of the Ford Ranger to get out of the truck. According to DUSM Badway, both Ms. Sprick and Defendant got out of the truck as instructed and were handcuffed for officer safety. DUSM Gambone asserts that as Defendant was being handcuffed DUSM Gambone realized that the passenger was not Tredway but instead was Defendant. DUSM Badway contends that DUSM White retrieved the handgun from the Ford Ranger right after Ms. Sprick and Defendant exited the Ford Ranger. Ms. Sprick indicated, at some point, to DUSM Badway that she and Defendant followed DUSM Badway because 3010 General Stillwell St. NE had been burglarized earlier that month and they wanted to see who was in the vehicle they were following. According to DUSM Badway, Ms. Sprick also told the DUSMs that she did not know Tredway and had never heard Defendant speak about Tredway.

Ms. Sprick, however, maintains that when the DUSMs ordered her and Defendant out of the Ford Ranger one of the DUSMs called Defendant by his name "Jerrad" thereby implying that the DUSMs knew that Defendant was the passenger from the beginning of the surveillance. Ms. Sprick further contends that the handgun was not in plain view and that DUSM White searched her truck twice before the handgun was found between a console and a front seat. Ms. Sprick also asserts that she gave consent to search the Ford Ranger only after the second search.

DUSM Badway testified that the length of time between the initial stop of the Ford Ranger and the time Ms. Sprick and Defendant were handcuffed or detained amounted to less than two minutes. Ms. Sprick gave no estimate of the time lapse between the stop and the

4

searches of her Ford Ranger.  The Court, therefore, finds DUSM Badway's estimate that less than two minutes elapsed between the initial stop of the Ford Ranger and the handcuffing or detention of Ms. Sprick and Defendant to be credible.  In addition, it is clear from the testimony of both Ms. Sprick and DUSM Badway that the events subsequent to the initial stop occurred very rapidly.

Once Ms. Sprick and Defendant were restrained, DUSM Gambone contacted Senior Special Agent Frank Ortiz III of the Bureau of Alcohol, Tobacco & Firearms to come out to the scene to investigate.  After SSA Ortiz gave Defendant his Miranda rights, Defendant stated to SSA Ortiz that he possessed the handgun, that he had prior felony convictions, and that he instructed Ms. Sprick to follow DUSM Badway.  Defendant was then arrested and charged with one count of felon in possession of a firearm and ammunition.[1]

The Court acknowledges that discrepancies exist between the sworn testimony of Ms. Sprick and the DUSMs regarding the DUSMs knowledge of who the passenger was and the visibility of and the precise time of the discovery of the handgun in the Ford Ranger.  These discrepancies, however, do not affect the Court's determination that the Motion to Suppress should be denied.  Consequently, the Court need not decide which version of the facts to find credible.

## Conclusions of Law

A.  Passenger Standing to Bring Fourth Amendment Challenge

A passenger in a vehicle who lacks the required possessory or ownership interest in the vehicle in which he is riding cannot directly challenge a search of that particular vehicle.  *United*

---

[1] SSA Ortiz also interviewed Ms. Sprick.  Ms. Sprick was later released at the scene and not charged with any criminal offenses.

*States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. ), *cert. denied*, 531 U.S. 887 (2000) (citations omitted)).  A passenger, however, can challenge the legality of his own seizure and seek to suppress the fruit of the illegal seizure found in the vehicle. *Id*.  A "seizure" under these circumstances includes an improper traffic stop, detention, or arrest. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995).

B.  The Initial Stop of the Truck

Defendant argues that his Fourth Amendment right to be free from an unreasonable seizure was violated because the initial traffic stop was pretextual and not based on a reasonable articulable suspicion that a traffic violation occurred or was occurring. The USA contends that the initial stop was a justifiable felony stop.[2]

The Court concludes that the DUSMs had the following reasonable justifications for initially stopping the Ford Ranger. First, Ms. Sprick's aggressive driving behind DUSM Badway constituted counter-surveillance activity which supports a reasonable suspicion to stop the Ford Ranger.  It is well-established that counter-surveillance conduct is "indicative of knowing participation in criminal activity" and can support a finding of reasonable suspicion. *United States v. Martinez-Molina*, 64 F.3d 719, 729 n.8 (1st Cir. 1989). *See also United States v. Lopez*, 518 F.3d 790, 799-800 (10th Cir. 2008) (counter-surveillance activity contributed to reasonable suspicion); *United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004) (counter-surveillance driving led to probable cause to arrest).  Second, the DUSMs had a compelling need to stop the

---

[2]Whether an officer has an ulterior motive for a stop does not strip the officer of any legally justifiable reason for a stop under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Ford Ranger for officer safety. Ms. Sprick's aggressive driving could have resulted in an accident with DUSM Badway and could have possibly ended in an altercation with someone, whether with Tredway or Defendant, who had a lengthy violent criminal history. It is settled that "[a] law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (citing *United States v. Alexander*, 907 F.2d 269, 272 (2nd Cir. 1990), *cert. denied*, 498 U.S. 1095 (1991)). The Tenth Circuit Court of Appeals "has long defended the ability of police officers to conduct safe investigatory stops." *Id*.

C. Detention of Defendant After the Initial Stop

Defendant also argues that the DUSMs unreasonably exceeded the scope of the traffic stop by detaining Defendant after the purpose of the traffic stop ended without a reasonable articulable suspicion of criminal activity.[3] Defendant maintains that once Ms. Sprick explained to DUSM Badway that she followed him because 3010 General Stillwell St. NE had been recently burglarized her improper driving should have been excused. According to Defendant, Ms. Sprick's explanation negates a reasonable suspicion of criminal activity. The USA again reiterates that the DUSMs did not stop the Ford Ranger for traffic law violations but rather the DUSMs conducted a felony stop.

The Court determines that the scope of the subsequent detention was reasonable because the DUSMs lawfully ordered Ms. Sprick and Defendant out of the vehicle for officer safety and

---

[3]In addition, the Defendant contends that the continued detention of Defendant was not a consensual encounter. The USA concedes that the continued detention was not a consensual encounter.

the length of detention was reasonable considering the totality of the circumstances.  It is clear that once a motor vehicle has been lawfully stopped, law enforcement officers can order the occupants of a vehicle out of the vehicle for officer safety without violating the Fourth Amendment.  *Maryland v. Wilson*, 519 U.S. 408, 413-15 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977).  Ms. Sprick's suspicious and aggressive driving plus the fact that the passenger (whether Tredway or Defendant) had a lengthy violent felony criminal history constituted more than enough evidence to reasonably justify the DUSMs ordering Ms. Sprick and Defendant out of Ford Ranger and handcuffing them for officer safety while the DUSMs investigated the situation.  Whether DUSM Badway initially saw the handgun in plain view or whether the handgun was found after a second search of the Ford Ranger, soon after the stop, does not affect the uncontroverted facts that the DUSMs were dealing with persons willing to drive in a dangerous reckless manner and that the passenger (whether Tredway or Defendant) could have reasonably been considered dangerous and possibly armed as well.  In addition, the length of Defendant's detention prior to his arrest was not disproportionately lengthy or unreasonable considering the totality of the circumstances surrounding the stop.

D.  Conclusion

The Court concludes that the Defendant did not carry his burden of proving that his seizure or detention violated the Fourth Amendment.  The DUSMs reasonably stopped the Ford Ranger for officer safety and reasonably continued to detain Defendant for officer safety until Defendant was arrested for being a felon in possession of a weapon and ammunition.  Without a Fourth Amendment violation, the seizure of Defendant's handgun and ammunition from the Ford Ranger cannot be considered the fruit of an illegal detention.  Hence, Defendant's Motion to Suppress should be denied.

IT IS ORDERED that DEFENDANT'S MOTION TO SUPPRESS ALL ITEMS SEIZED FROM THE VEHICLE BELONGING TO DEBRA SPRICK AS A FRUIT OF AN UNCONSTITUTIONAL STOP AND DETENTION (Doc. No. 28) is denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE